IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
SOUTHERN DIVISION

NOAH DON FAVRE                                              PLAINTIFF

VERSUS                              CIVIL ACTION NO. 1:21-cv-00328-BWR

HARRISON COUNTY, MISSISSIPPI, et al.                      DEFENDANTS

<u>MEMORANDUM OPINION AND ORDER OF DISMISSAL</u>

Proceeding *pro se* and *in forma pauperis*, Plaintiff Noah Don Favre is a prisoner in the custody of the Mississippi Department of Corrections ("MDOC") being housed at the Marion/Walthall County Correctional Facility in Columbia, Mississippi. Notice [110] at 1. Plaintiff filed this civil action under 42 U.S.C. § 1983, alleging excessive force during an arrest and the subsequent denial of medical care by his custodians. Compl. [1] at 4-5. Plaintiff names twenty-one Defendants that fall into four categories: (1) Harrison County, Mississippi; (2) the law-enforcement Defendants, including Sheriff Troy Peterson, Sergeant B. Auringer, Investigator W. Collins, Deputy D. Boney, Deputy M. Giardini, Deputy R. Barber, Deputy M. Giouard, Deputy R. Hubbard, Deputy Z. Cobb, Investigator C. Serpas, Investigator D. Bryant, Investigator J. Johnson, Investigator J. Merritt, Investigator J. Putnam, Investigator K. French, K-9 Deputy C. Allen, K-9 Deputy B. Taylor, and Investigator J. Ladner; (3) Nurse Dana Jones; and (4) unidentified MBN Agents.[1]

The Court held an Omnibus Hearing on March 20, 2023, to give Plaintiff a

---

[1] Plaintiff originally named Memorial Hospital as Defendant too. It was dismissed as Defendant for Plaintiff's failure to comply with the notice requirements of the Mississippi Tort Claims Act. Order [98] at 1-2.

chance to clarify his claims.[2]   Five dispositive motions are now pending before the Court.   On May 15, 2023, the law-enforcement Defendants filed a Motion [84] for Summary Judgment Due to Plaintiff's Failure to Exhaust Administrative Remedies. Harrison County joined [86] that Motion [84] and requested judgment as a matter of law for the same reason.   On June 16, 2023, the law-enforcement Defendants filed a Motion [89] for Summary Judgment and Immunity.   Again, Harrison County joined [96] that Motion [89] and requested judgment as a matter of law for the same reason. Finally, Jones filed a Motion [108] for Summary Judgment on November 15, 2023. Favre filed two Responses [115] [116].

For the following reasons, the law-enforcement Defendants' Motion [84] for Summary Judgment Due to Plaintiff's Failure to Exhaust Administrative Remedies will be denied.   Harrison County's Motion [86] for Summary Judgment, also based on the exhaustion of administrative remedies, will be granted in part and denied in part. The law-enforcement Defendants' Motion [89] for Summary Judgment and Immunity will be granted.   Harrison County's Motion [96] for Summary Judgment, also based on the merits of Plaintiff's claims, will be granted.   And Jones's Motion [108] for Summary Judgment, based on the exhaustion of administrative remedies and the merits of Plaintiff's claims, will be granted.   Finally, the unidentified MBN Agents

---

[2] *See Spears v. McCotter*, 766 F.2d 179, 181-82 (5th Cir. 1985) (authorizing the magistrate judge to "hold an evidentiary hearing" to allow a *pro se* plaintiff to provide a "more definite statement"), *abrogated on other grounds by Neitzke v. Williams*, 490 U.S. 319, 324 n.3 (1989).   Citations to the Omnibus Hearing Transcript are denoted by "(Tr.)," and the Transcript is available on the Court's docket as Document No. 81.

will be dismissed *sua sponte*.  This case will be closed.

# I. BACKGROUND

## A. Plaintiff's Allegations

On October 22, 2020, Plaintiff was on probation for being a felon in possession of a controlled substance.  (Tr. 28).  That afternoon, Plaintiff says that the law-enforcement Defendants came to his home to serve him with a warrant for violating his probation.  Compl. [1] at 5; Resp. [22] at 1.  He knew when the officers arrived because he has a "camera system," but he decided to use the bathroom before exiting the residence.  (Tr. 7, 50).  Plaintiff testified that the officers "didn't even give [him] two minutes" to exit his residence before they escalated the situation.  (Tr. 7).

Plaintiff accuses the officers of shooting "several cans of gas in [his] camper," which burned his eyes, throat, nose, and skin.  Compl. [1] at 5.  Specifically, Plaintiff testified that officers "shot six cans of gas" in his camper within "13 minutes" of their arrival.  (Tr. 7).  During the altercation, the officers allegedly slammed Plaintiff on his head and shot him three times with a taser.  Compl. [1] at 5.  He also says that they "beat on [him] for a long . . . time . . . for no reason whatsoever."  Resp. [22] at 1. At that point, Plaintiff says the officers threw him out of his camper with "no pants [or] boxers on," and he started coughing up blood.  Compl. [1] at 5.

Plaintiff testified that officers then took him to Memorial Hospital—instead of Garden Park Hospital, which was closer to his home.  (Tr. 8); Compl. [1] at 4-5.  While he was handcuffed to the bed, an unnamed nurse allegedly "put a tube in [his] private

3

area" and told him to "shut up" because he "ha[s] no rights."[3]  Compl. [1] at 4.  During the nurse's examination, Plaintiff claims that "15 to 20 plain clothes wearing police" gathered around his bed to laugh at him and "mak[e] fun of how [he] looked."  Resp. [22] at 3.  Plaintiff remembers waking up "days later in [the] Harrison County Jail laying in blood and crap."  Compl. [1] at 4.  At that time, he says he could not talk, his vision was poor, and his head was swollen with "several cracks and large indentions in his skull."  *Id*.

Some time after this, Plaintiff says that he experienced a bleeding episode at urgent care while being tested for COVID-19.  *Id*.  He was then told that he has life-threatening issues, for which he needed to see a doctor.  *Id*.  Eleven days later, Plaintiff says that he was referred to a neurologist, but jail staff would not let the doctor examine Plaintiff "in any way but words."  *Id*.

Plaintiff claims that he "still hurts [to] this day" because of the injuries that Defendants inflicted.  Resp. [22] at 1.  He claims several skull fractures and injuries to both shoulders.  *Id*.  He also claims that he "had to relearn how to speak" and suffers memory loss, headaches, and problems with his eyesight.  *Id*.  Plaintiff also claims that he suffers "flash backs of what they did to [him]."  *Id*.  Plaintiff reports that x-rays taken subsequent to the altercation show skull fractures and a broken collar bone, which healed on its own.  *Id*.

Plaintiff sues Harrison County and Sheriff Peterson because they employ

---

[3] Plaintiff was unable to identify this nurse at the Omnibus Hearing, and she has not been named as a Defendant.  (Tr. 18).

many of the Defendants who allegedly assaulted him. Resp. [22] at 5; (Tr. 12-13). He sues the other law-enforcement Defendants because they were present at the scene of the attack and "were either the ones using excessive force or watching and [listening] to [the others] use excessive force." Resp. [25] at 3-4. Plaintiff testified that only Defendants Serpas, Allen, Taylor, and Boney were present inside his home and inflicted physical harm on him. (Tr. 23-24). The remaining law-enforcement Defendants were sued because they were present during the incident and did nothing to prevent the alleged use of excessive force. (Tr. 20-27). At the Omnibus Hearing, Plaintiff clarified that he sued the law-enforcement Defendants *solely* for their use of excessive force during his arrest on October 22, 2020. (Tr. 81-82). He never "requested any medical treatment or care from any of the" law-enforcement Defendants. (Tr. 81-82). And Plaintiff sued Jones, who was employed as a nurse by the Harrison County Adult Detention Center ("HCADC"), for treatment that she allegedly failed to provide. (Tr. 16, 100).

### B. Defendants' Summary-Judgment Evidence

Along with their Motion [89] for Summary Judgment, the law-enforcement Defendants submitted affidavits from eyewitnesses, incident reports and other police records, Plaintiff's medical records, and Deputy Brandon Taylor's body-camera footage of Plaintiff's arrest. The 48 minutes of body-camera footage, conventionally filed as Exhibit D to their Motion [89], largely confirms the following account; any unconfirmed details are noted where appropriate.

5

Deputy Zack Cobb testified by affidavit that "numerous . . . Harrison County deputies executed a warrant" at Plaintiff's address on the day in question. Mot. [89-5] at 1. Plaintiff "was a known individual with a criminal history," and the deputies were "made aware that [he] had a gun of some kind in the camper with him." *Id.* at 2. The body-camera footage shows officers questioning people at the scene about whether the gun in the camper was a BB gun, handgun, or rifle. The deputies then "used every means available . . . to have [Plaintiff] vacate the camper peacefully," including "sirens and loud speaker commands." *Id.* at 1-2; *see also* Mot. [89-6] at 9. Deputy Taylor testified that he heard officers ask Plaintiff to exit his camper "a minimum of 43 times prior to entering." Att. [92] at 2. Two other people were inside the camper with Plaintiff at the time, and both "vacated the camper without incident." Mot. [89-5] at 2.

Plaintiff ignored commands to vacate the camper for the better part of an hour. *Id.* Officers deployed gas canisters inside the camper multiple times, and all attempts were unsuccessful. *Id.* Around 45 minutes into his body-camera footage of the standoff, Deputy Taylor entered the camper with his K-9 to apprehend Plaintiff. Att. [92] at 2. Despite "two loud and distinct warnings that [he] would be entering the camper with a K-9," Plaintiff did not surrender. Att. [92] at 2.

Instead, Deputy Taylor found Plaintiff seated on the toilet in the bathroom—with his pants down around his ankles. *See* Mot. [89-6] at 8. The body-camera footage shows Plaintiff completely doubled over at the waist, with his hands obscured from

view in the cluttered bathroom.  Deputy Taylor "attempted to pull [Plaintiff] out of the bathroom," but Plaintiff "slipped out of his grip."  *Id*.  Next, "Deputy Boney grabbed [Plaintiff] and attempted to pull him to a more secure location to put restraints on him."  *Id*.  The body-camera footage shows deputies pulling Plaintiff by the shirt toward the camper's door, but he pulled away.

At that point, Deputy Boney noticed that Plaintiff "had a broken piece of glass in his left hand."  *Id*.  Deputy Boney also reported that Plaintiff "lunged towards [his] patrol rifle, which was slung across his chest."  *Id*.  Neither of these details are clear from the body-camera footage because Plaintiff's hands are not always in view of the camera during the scuffle.

When Deputy Cobb entered the camper, he "observed [Plaintiff] resisting arrest in a confined area."  Mot. [89-5] at 5.  He once attempted to deploy his taser to "an exposed area of [Plaintiff's] lower right oblique," but the taser did not deploy properly.  *Id*.  At that point, the tactical team "physically gained control of [Plaintiff] until he could be restrained and arrested."  Mot. [89-5] at 2.  Deputy Cobb administered "a series of 3 strikes to [Plaintiff's] brachial plexus to stun [him] while other team members attempted to gain control of [his] hands."  *Id*. at 5.  When Deputy Cobb heard Plaintiff say "'alright' or something indicating he was surrendering," Plaintiff "was then detained without further incident."  *Id*.  Deputy Taylor's body-camera footage shows the fray lasting approximately two minutes.

According to Deputy Allen's incident report, Plaintiff was "transported . . . to a

local hospital for injuries" immediate after he was detained.   Mot. [89-6] at 9.
Plaintiff's medical records confirm that he arrived at Memorial Hospital in Gulfport,
Mississippi, at 4:03 p.m.   Ex. [94] at 5.   Upon intake, police informed hospital
personnel that Plaintiff had likely "swallowed approx[imately] 2 grams of
meth[amphetamine]" that afternoon.   *Id.* at 9.   According to his medical records,
Plaintiff was "[a]lert," "[a]wake," and "[c]alm" during the examination.   *Id.* at 11.
Plaintiff reported "a headache that [was] generalized and achy," but he denied "any
other symptoms at [that] time."   *Id.* at 12.   During his hospital stay, Plaintiff received
a CT scan of his head and abdomen, an EKG, and a chest x-ray—all of which returned
normal results.   *Id.* at 14-21.

About 6 weeks later, Plaintiff received another x-ray of his right shoulder,
which also revealed "no fracture or dislocation."   *Id.* at 7.   A month after that, he
received another CT scan of his cervical spine, which again showed "[n]o fracture or
malalignment."   Ex. [94] at 32.   At the same time, another CT scan of his head
revealed "[n]o significant intracranial abnormality."   Mot. [108-3] at 10.

## C. Plaintiff's Administrative Remedies

Plaintiff testified that he has been housed at HCADC "[t]hree or four" times
during his adult life.   (Tr. 46).   As a result, he has read the Inmate Handbook,
understands how to use the kiosk system, and knows how to file an administrative
grievance at HCADC.   (Tr. 79).   When he was booked on October 22, 2020, Plaintiff
signed a Classification Assessment confirming that he knows "[h]ow to [r]eport [a]

[g]rievance." Mot. [84-2] at 3.

Plaintiff testified that he filed an administrative grievance on March 25, 2021, pertaining to the allegations raised in this lawsuit. (Tr. 83). At that time, he complained about "head . . . and shoulder injuries" that have "gotten . . . worse" since he entered HCADC on October 22, 2020. Mot. [84-3] at 3. Plaintiff complained that he still had not seen a doctor, despite "hav[ing] paperwork" to describe his "life threating [*sic*] issues." *Id*. Plaintiff received a first-step response on March 26, 2021, advising that he saw a medical provider on November 3, 2020. *Id*. at 1-2. At that time, Plaintiff's x-rays and CT scan revealed "no injuries," and a later examination also revealed "[f]ull [r]ange of [m]otion and no obvious injury." *Id*. at 2.

Deborah Whittle, who serves as "Grievance Officer" at HCADC, testified by affidavit that Plaintiff "did not submit a second step or third step in the grievance process for [the] grievance . . . which is the subject of this lawsuit." Mot. [84-4] at 2. Plaintiff disagrees; he testified that he filed a second-step grievance, but he has yet to produce it. (Tr. 84).

## II. STANDARD OF REVIEW

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). "A dispute is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Westfall v. Luna*, 903 F.3d 534, 546 (5th Cir. 2018) (quotation omitted). "An issue is material if

its resolution could affect the outcome of the action." *Sierra Club, Inc. v. Sandy Creek Energy Assocs., L.P.*, 627 F.3d 134, 138 (5th Cir. 2010) (quotation omitted). "On a motion for summary judgment, the court must view the facts in the light most favorable to the non-moving party and draw all reasonable inferences in its favor." *E.E.O.C. v. WC&M Enters., Inc.*, 496 F.3d 393, 397 (5th Cir. 2007).

"Summary judgment is proper if the movant demonstrates that there is an absence of genuine issues of material fact." *Topalian v. Ehrman*, 954 F.2d 1125, 1131 (5th Cir. 1992). "The movant accomplishes this by informing the court of the basis for its motion, and by identifying portions of the record which highlight the absence of genuine factual issues." *Id.* "Rule 56 contemplates a shifting burden: the nonmovant is under no obligation to respond unless the movant discharges its initial burden of demonstrating entitlement to summary judgment." *Mack v. Waffle House, Inc.*, No. 1:06-cv-00559-RHW, 2007 WL 1153116, at *1 (S.D. Miss. Apr. 18, 2007) (quotation and brackets omitted). "[O]nce a properly supported motion for summary judgment is presented, the nonmoving party must rebut with 'significant probative' evidence." *Id.* (quoting *Ferguson v. Nat'l Broad. Co., Inc.*, 584 F.2d 111, 114 (5th Cir. 1978)).

## III. DISCUSSION

All named Defendants have requested judgment as a matter of law on two grounds: (1) exhaustion of administrative remedies and (2) the merits of Plaintiff's claims against them. For the following reasons, Jones and Harrison County are

entitled to summary judgment because Plaintiff failed to exhaust administrative remedies with respect to claims arising after his incarceration.  But Plaintiff was not required to exhaust his administrative remedies on his claims against the law-enforcement Defendants—all of which arose before he was incarcerated.   All Defendants are entitled to judgment as a matter of law on the merits of Plaintiff's claims.  The pending Motions [84] [86] [89] [96] [108] will be decided accordingly.  *See infra* at Section IV.

### A.  Plaintiff failed to exhaust his administrative remedies with respect to his claims arising *after* incarceration.

"Exhaustion of administrative remedies through the prison grievance system is a prerequisite for lawsuits filed under § 1983.  *Wright v. Hollingsworth,* 260 F.3d 357, 358 (5th Cir. 2001); *see also* 42 U.S.C. § 1997e(a) ("No action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in a jail, prison, or other correctional facility until such administrative remedies as are available have been exhausted.").   "Exhaustion is mandatory for 'all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong.'"  *Alexander v. Tippah Cnty.*, 351 F.3d 626, 630 (5th Cir. 2003 (quoting *Porter v. Nussle*, 534 U.S. 516, 532 (2002)).  The Fifth Circuit Court of Appeals takes a "strict approach" to the exhaustion requirement.  *Johnson v. Ford*, 261 F. App'x 752, 755 (5th Cir. 2008) (quotation omitted).

A prisoner cannot satisfy the exhaustion requirement "by filing an untimely or

otherwise procedurally defective administrative grievance or appeal." *Woodford v. Ngo*, 548 U.S. 81, 83-84 (2006). "Merely initiating the grievance process or putting prison officials on notice of a complaint is insufficient to meet the exhaustion requirement." *Evans v. Harrison Cnty. Adult Detention Ctr.*, No. 1:18-cv-00087-RHW, 2020 WL 980149, at *1 (S.D. Miss. Feb. 28, 2020). "The grievance process must be carried through to its conclusion before suit can be filed under the Prison Litigation Reform Act." *Id.* A properly exhausted claim is one that has "complete[d] the administrative review process in accordance with the applicable procedural rules." *Woodford*, 548 U.S. at 88. Those rules "are defined not by the PLRA, but by the prison grievance process itself." *Jones v. Bock*, 549 U.S. 199, 218 (2007).

According to HCADC's Inmate Handbook, "HCADC has a formal three (3) step grievance policy for use by all inmates," which must be exhausted "before [an inmate] proceed[s] with filing a lawsuit." Mot. [84-4] at 4. To start, "[a]ll grievances must be filed on the correct standard grievance form provided." *Id.* "If an inmate is not satisfied with the Level I response, he . . . may proceed to Level II (Deputy Warden)." *Id.* "If not satisfied with a Level II response, he . . . may proceed to Level III (Warden)." *Id.* "Level III is the final step in the process." *Id.*

### i. *Jones and Harrison County*

Plaintiff's claims against Jones, and his claims against Harrison County to the extent they arose after he was incarcerated, must be dismissed without prejudice for failure to exhaust administrative remedies. The record evidence shows that Plaintiff

filed one administrative grievance related to the allegations raised in his Complaint. *See* Mot. [84-3] at 3.  On March 25, 2021, he complained about "head injuries" and "shoulder injuries" that "ha[d] . . . gotten . . . worse" during his stay at HCADC.  *Id*. He alleged that medical staff refused to give him "any proper medical treatment."  *Id*. Assuming this grievance is sufficiently specific to identify any named Defendants, the record evidence demonstrates that Plaintiff "did not complete the second or third step to the formal grievance process."  Mot. [84-4] at 2.

Plaintiff insists that he "filed more than one" grievance, but he could not produce additional grievances at the Omnibus Hearing.  (Tr. 84).  Nor did he attach these additional grievances to his summary-judgment Responses [115] [116].  "[T]he nonmoving party cannot defeat summary judgment with conclusory allegations, unsubstantiated assertions, or only a scintilla of evidence."  *Tillis v. Mgmt. Training Corp.*, No. 5:15-cv-00018-MTP, 2015 WL 5177626, at *1 (S.D. Miss. Sept. 4, 2015) (quotations omitted).  Nor can he "survive a proper motion for summary judgment by resting on the allegations in his pleadings."  *Id*.  "Instead, the nonmovant must present evidence sufficient to support a resolution of the factual issues in his favor." *Id*.  Plaintiff has not done so.

In any event, Plaintiff testified that he received a "final denial" on his administrative grievances against Jones on February 14, 2022, (Tr. 17)—several months after he filed this lawsuit.  But the grievance process must be completed *before* filing suit in federal court.  *Gonzalez v. Seal*, 702 F.3d 785, 788 (5th Cir. 2012).

"District courts have no discretion to excuse a prisoner's failure to properly exhaust the prison grievance process before filing their complaint." *Id.* Thus, Harrison County's Motion [86] for Summary Judgment will be granted in part and denied in part; any claims against Harrison County arising after Plaintiff's incarceration will be dismissed without prejudice. Jones's Motion [108] for Summary Judgment will be granted, as more fully set forth below, and Plaintiff's claims against her will also be dismissed without prejudice. *See infra* at Section III(B)(iii).

### ii. The Law-Enforcement Defendants

The law-enforcement Defendants are not entitled to summary judgment based on Plaintiff's failure to exhaust administrative remedies. The PLRA requires an incarcerated Plaintiff to "exhaust his available administrative remedies before filing a claim about 'prison conditions' in federal court." *Willard v. Hearn*, No. 1:19-cv-00908-RPM, 2021 WL 4099019, at *2 (S.D. Miss. Sept. 8, 2021) (quoting 42 U.S.C. § 1997e(a)). "The obvious limit to the plain wording of the term 'prison conditions' is that only claims relating to conditions within a prison or correctional facility are subject to the exhaustion requirements." *Id.* (quotation and alterations omitted). "[W]hen considering whether a claim is about prison life or conditions, the Court focuses on whether the claim arises from conduct or events occurring in prison, . . . not the claim's potential nexus to conduct or events occurring outside of prison." *Id.* (citations omitted).

Thus, "preincarceration claims fall outside § 1997e(a)," including claims

against an arresting officer.  *See Porter*, 534 U.S. at 529; *see also Wilson v. Thomas*, No. H-07-1104, 2008 WL 2491650, at *4 n.4 (S.D. Tex. June 18, 2008) ("[T]he exhaustion requirement does not apply to [the plaintiff's] claim that excessive force was used during his arrest. . . ."); *Roach v. Bandera Cnty.*, No. SA-02-CA-106XR, 2004 WL 1304952, at *4 (W.D. Tex. June 9, 2004) ("Plaintiff's complaint that [the defendant] violated his Fourth Amendment right to be free from excessive force during his arrest . . . is not covered by the PLRA's exhaustion requirement.").  At the Omnibus Hearing, Plaintiff confirmed that he was only suing the law-enforcement Defendants for their use of excessive force during his arrest on October 22, 2020.  (Tr. 81-82).  He never "requested any medical treatment or care from any of the" law-enforcement Defendants after he arrived at HCADC.  (Tr. 81-82).  Because Plaintiff has not sued the law-enforcement Defendants for any claims about his prison conditions, the exhaustion requirement does not apply.[4]  Thus, thus law-enforcement Defendants' Motion [84] for Summary Judgment Due to Plaintiff's Failure to Exhaust Administrative Remedies will be denied.

## B. All Defendants must be dismissed on the merits of Plaintiff's claims against them.

### i.  The Law-Enforcement Defendants

#### a.  Individual-Capacity Claims

The law-enforcement Defendants argue that they are entitled to qualified

---

[4] Plaintiff recognized this nuance in his summary-judgment Response [116]: "I was not in prison when the police used excessive force . . . How do I write a grievance on them when they are not [employed] . . . at [the] Harrison County Jail[?]"  Resp. [116] at 2.

immunity from Plaintiff's excessive-force claims against them. Mot. [89] at 2. "A good-faith assertion of qualified immunity alters the usual summary judgment burden of proof, shifting it to the plaintiff to show that the defense is not available." *Cass v. City of Abilene*, 814 F.3d 721, 728 (5th Cir. 2016) (quotations omitted). To do so, Plaintiff must "identify specific evidence in the summary judgment record demonstrating that there is a material fact issue concerning the essential elements of its case for which it will bear the burden of proof at trial." *Forsyth v. Barr*, 19 F.3d 1527, 1533 (5th Cir. 1994). "Conclusory allegations and denials, speculation, improbable inferences, unsubstantiated assertions, and legalistic argumentation are all insufficient to overcome immunity." *Orr v. Copeland*, 844 F.3d 484, 490 (5th Cir. 2016) (quotations omitted). Because there is a video recording of the incident, the Court need not "accept factual allegations that are blatantly contradicted by the record." *See Tucker v. City of Shreveport*, 998 F.3d 165, 170 (5th Cir. 2021) (quotations omitted). Instead, the Court will "view[] the facts in the light depicted by the videotape." *See Scott v. Harris*, 550 U.S. 372, 381 (2007).

"The doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). Qualified immunity "gives government officials breathing room to make reasonable but mistaken judgments," and "protects all but the plainly

incompetent or those who knowingly violate the law." *Ashcroft v. al-Kidd*, 563 U.S. 731, 743 (2011) (quotation omitted).

"A two-pronged test determines whether defendants are entitled to qualified immunity: (1) Did the plaintiff allege the violation of a constitutional right? (2) Was the conduct objectively unreasonable in light of clearly established law at the time the challenged conduct occurred?" *Gaines v. Jefferson Cnty. Sch. Dist.*, No. 5:22-cv-00032-DCB-FKB, 2023 WL 8482893, at *2 (S.D. Miss. Dec. 7, 2023). The Court "may exercise [its] sound discretion in deciding which of the two prongs should be addressed first." *Id.* (citing *Pearson*, 555 U.S. at 236). "Ultimately, a state actor is entitled to qualified immunity if his . . . conduct was objectively reasonable in light of the legal rules that were clearly established at the time of his . . . actions." *McClendon v. City of Columbia*, 305 F.3d 314, 323 (5th Cir. 2002).

"[T]o state a violation of the Fourth Amendment prohibition on excessive force, the plaintiff must allege: (1) an injury that (2) resulted directly and only from the use of force that was excessive to the need, and (3) the use of force that was objectively unreasonable." *Bush v. Strain*, 513 F.3d 492, 500-01 (5th Cir. 2008). "The objective reasonableness of the force . . . depends on the facts and circumstances of the particular case, such that the need for force determines how much force is constitutionally permissible." *Id.* at 501. "Specifically, the court should consider 'the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or

attempting to evade arrest by flight.'" *Id.* (quoting *Graham v. Connor*, 490 U.S. 386, 396 (1989)).  The Court "must evaluate an officer's use of force from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Poole v. City of Shreveport*, 691 F.3d 624, 628 (5th Cir. 2012) (quotation omitted). "Any evil intentions motivating an officer's objectively reasonable use of force will not make a Fourth Amendment violation." *Id.*

After reviewing the summary-judgment evidence, including the body-camera footage of the incident, the Court has determined that the law-enforcement Defendants used an objectively reasonable degree of force in Plaintiff's apprehension and arrest.  To start, officers were aware that Plaintiff had "a criminal history," including gang affiliation, and "a gun of some kind in the camper." Mot. [89-5] at 2; (Tr. 46).  So they approached Plaintiff's residence in broad daylight and gave him nearly an hour to surrender himself peacefully.  Mot. [89-5] at 2; Att. [92] at 2.  The officers used sirens to signal their presence, and they asked Plaintiff more than 40 times by loudspeaker to exit the camper and make himself known.  Mot. [89-5] at 1- 2.  Plaintiff admitted that he knew when officers arrived, (Tr. 50), and his houseguests surrendered themselves without incident, Mot. [89-5] at 2.  The officers then deployed non-lethal gas several times to flush Plaintiff from his hiding place, and Deputy Taylor entered with his K-9 only after providing two more verbal warnings.  Mot. [89-5] at 2; Att. [92] at 2.

When Deputy Taylor entered the camper, Plaintiff was seated on the toilet—

bent at the waist with his hands hidden near his feet.  Mot. [89-6] at 8.  The K-9 was
unable to apprehend him, and Deputy Taylor had trouble maintaining his grip too.
Mot. [89-6] at 8.  As other officers entered the cramped camper, they reported seeing
Plaintiff holding a broken piece of glass and lunging for one of their service rifles.
Mot. [89-6] at 8.  Deputy Cobb warned Plaintiff about the taser deployment (which
was unsuccessful), and the remaining officers were able to restrain Plaintiff about
two minutes after the physical altercation began.  Mot. [89-5] at 5.  Plaintiff was
immediately transported to the hospital for his injuries.  Mot. [89-6] at 9.

Plaintiff argues that he "was not combative [or] aggressive in any way."  Resp.
[116] at 3.  But Plaintiff's refusal "to turn around and be handcuffed . . . posed an
immediate threat to the safety of the officers."  *See Poole*, 691 F.3d at 629 (quotation
omitted).  This, coupled with his "erratic behavior" and repeated "failure to comply,"
led officers to infer that he was "actively resist[ing]" arrest.  *See Cadena v. Ray*, 728
F. App'x 293, 296 (5th Cir. 2018) (quotation omitted).  Whether Plaintiff was actually
resisting is irrelevant.  "A court must measure the force used under the facts as a
reasonable officer *would perceive them*, not necessarily against the historical facts."
*Griggs v. Brewer*, 841 F.3d 308, 313 (5th Cir. 2016).  Considering the totality of the
circumstances, Plaintiff's actions would amount to resistance to a reasonable officer.

The record evidence shows that "officers reacted with measured and ascending
responses" to Plaintiff's physical resistance—including verbal warnings, gas
canisters, physical restraint, and an attempted taser deployment.  *See Galvan v. City*

19

*of San Antonio*, 435 F. App'x 309, 311 (5th Cir. 2010) (affirming the application of qualified immunity where officers subdued a fleeing suspect by "verbal warnings, pepper spray, hand- and arm-manipulation techniques, and then the use of a [t]aser"); *see also Poole*, 691 F.3d at 629 (affirming the application of qualified immunity where officers used escalating force in response to "immediate and persistent" resistance). And they "immediately called for help" to treat Plaintiff's injuries once the altercation was over. *See Poole*, 691 F.3d at 629. Their actions were objectively reasonable in light of clearly established law at the time of the incident, and the law-enforcement Defendants are entitled to qualified immunity in their individual capacities.

### a. Official-Capacity Claims

"[A]n official-capacity suit is, in all respects other than name, to be treated as a suit against the entity." *Kentucky v. Graham*, 473 U.S. 159, 166 (1985). "It is *not* a suit against the official personally, for the real party in interest is the entity." *Id*. "Thus, . . . a plaintiff seeking to recover on a damages judgment in an official-capacity suit must look to the government entity itself." *Id*.

With respect to any official-capacity claims against the law-enforcement Defendants, Harrison County is "the real party in interest" before the Court. *See Harris v. Jackson Cnty.*, No. 1:14-cv-00435-LG-RHW, 2015 WL 1427412, at *2 (S.D. Miss. Mar. 27, 2015) (quotation omitted). Those claims are "duplicative or redundant" to Plaintiff's claims against Harrison County, and they should be

20

dismissed.  *See id.* (quotation omitted).  The law-enforcement Defendants' Motion [89] for Summary Judgment and Immunity will be granted, and Plaintiff's claims against them will be dismissed with prejudice.

### ii. *Harrison County*

Harrison County argues that Plaintiff has failed to state a constitutional claim against it.  Mem. [90] at 13-16; Mot. [96] at 1.  "Municipal liability under Section 1983 requires that a plaintiff prove three elements: a policymaker; an official policy; and a violation of constitutional rights whose moving force is the policy or custom." *Ducksworth v. Rook*, No. 2:14-cv-00146-KS-MTP, 2015 WL 737574, at *2 (S.D. Miss. Feb. 20, 2015); *see also Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978).  A "policy or custom" can be either:

> (1) a policy statement, ordinance, regulation, or decision that is officially adopted and promulgated by the municipality's lawmaking officers or by an official to whom the lawmakers have delegated policy-making authority; or (2) a persistent, widespread practice of city officials or employees, which, although not authorized by officially adopted and promulgated policy, is so common and well settled as to constitute a custom that fairly represents municipal policy.

*Felter v. Brown*, No. 5:11-cv-00046-DCB-MTP, 2014 WL 51335, at *2 (S.D. Miss. Jan. 7, 2014) (citing *McGregory v. City of Jackson*, 335 F. App'x 446, 448-49 (5th Cir. 2009)).  "The description of a policy or custom and its relationship to the underlying constitutional violation . . . cannot be conclusory; it must contain specific facts." *Spiller v. City of Tex. City*, 130 F.3d 162, 167 (5th Cir. 1997).

Municipal liability cannot be based on *respondeat superior* "because the text of

[S]ection 1983 will not bear such a reading." *Piotrowski v. City of Houston*, 237 F.3d 567, 578 (5th Cir. 2001). "Consequently, the unconstitutional conduct must be directly attributable to some sort of official action or imprimatur; isolated unconstitutional actions by municipal employees will almost never trigger liability." *Id.* That is, municipal liability is "limited to acts that are, properly speaking, acts of the municipality—that is, acts which the municipality has officially sanctioned or ordered." *Pembaur v. City of Cincinnati*, 475 U.S. 469, 480 (1986) (quotation omitted).

Plaintiff's municipal-liability claim against Harrison County fails because he has not suffered a violation of his constitutional rights. *See supra* at Section III(B)(i) (no constitutional violation based on excessive force); *infra* at Section III(B)(iii) (no constitutional violation based on denial of medical care). "It necessarily follows that, without an underlying *constitutional* violation, there can be no § 1983 liability imposed" against the municipality. *See Becerra v. Asher*, 105 F.3d 1042, 1047-48 (5th Cir. 1997). Even if Plaintiff had established a constitutional violation, he has "alleged no specific policy statement, ordinance, regulation, or decision that was the moving force" behind the alleged constitutional violation. *See Ducksworth*, 2015 WL 737574, at *2. In other words, Plaintiff does not claim that Harrison County has an official policy or well-settled custom of using excessive force against arrestees and subsequently denying them medical care—only that it happened to him in one instance. At the Omnibus Hearing, Plaintiff even testified that he was not "aware of" any such policy. (Tr. 13). Without any such allegation (or proof to support it),

Harrison County is entitled to judgment as a matter of law.  Plaintiff does not argue otherwise.  Resp. [115] [116].  Harrison County's Motion [96] for Summary Judgment is granted, and Plaintiff's claims against Harrison County are dismissed with prejudice.

### iii. Dana Jones

As previously discussed, Plaintiff's claims against Jones must be dismissed without prejudice for his failure to exhaust administrative remedies against her.  *See supra* Section III(A)(i).  Alternatively, Jones is entitled to judgment as a matter of law on Plaintiff's claim for the denial of medical care.

"A government official violates a pretrial detainee's Fourteenth Amendment right to medical care when the official acts with deliberate indifference to the detainee's serious medical needs."  *Deroche v. Hancock Cnty.*, No. 1:18-cv-00215-LG-RPM, 2021 WL 2556598, at *5 (S.D. Miss. June 22, 2021).  "To meet the extremely high standard for proving deliberate indifference, . . . [P]laintiff must show that [Jones was] aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, that [she] actually drew the inference, and that [she] disregarded that risk by failing to take reasonable measures to abate it."  *See id*. "[P]laintiff can demonstrate deliberate indifference by showing that [Jones] 'refused to treat him, ignored his complaints, intentionally treated him incorrectly, or engaged in any similar conduct that would clearly evince a wanton disregard for any serious medical needs.'"  *Id*. (quoting *Baughman v. Hickman*, 935 F.3d 302, 309 (5th Cir.

2019)).  "Deliberate indifference is an extremely high standard to meet."  *Domino v. Tex. Dep't of Criminal Justice*, 239 F.3d 752, 756 (5th Cir. 2001).

"A serious medical need is one for which treatment has been recommended or for which the need is so apparent that even laymen would recognize that care is required."  *Gobert v. Caldwell*, 463 F.3d 339, 345 n.12 (5th Cir. 2006).  "Minor symptoms such as headaches are not normally considered serious medical needs for which the constitution mandates prompt medical care."  *Mayo v. Caddo Corr. Ctr.*, No. 20-cv-724, 2021 WL 2419451, at *5 (W.D. La. May 26, 2021) (quotation omitted), *report and recommendation adopted by* 2021 WL 2416981, at *1 (W.D. La. June 14, 2021).  Nor are minor "aches and pains."  *Barber v. Travis*, No. 07-3166, 2007 WL 3046647, at *6 (E.D. La. Oct. 15, 2007) (collecting cases); *see also Dickson v. Coleman*, 569 F.2d 1310, 1311 (5th Cir. 1978) (rejecting deliberate-indifference claims based on "continuing shoulder pain" where the inmate had "full range of motion").

The evidence before the Court disproves that Plaintiff suffered a serious medical need arising from his apprehension and arrest on October 22, 2020.  Plaintiff insists that he suffered "head . . . and shoulder injuries" that have "gotten . . . worse" over time.  *See* Mot. [84-3] at 3.  But his medical records, some documented contemporaneously with the incident, demonstrate otherwise.  At Memorial Hospital immediately after the scuffle, Plaintiff reported "a headache that [was] generalized and achy," but denied "any other symptoms at [that] time."  Ex. [94] at 12.  Notably, Plaintiff did not complain of a shoulder injury at that time, and his medical records

indicate "[g]ood range of motion in all major joints."  Mot. [108-2] at 2.  Staff at Memorial performed both a CT scan of Plaintiff's head and a chest x-ray, and both returned normal results.  Ex. [94] at 12-21.

A month later, Plaintiff received another x-ray for "shoulder pain" at HCADC. Mot. [108-4] at 1.  The report showed "[m]ild degenerative changes with no fracture or dislocation."  *Id*.  Two months later, Plaintiff presented at Singing River Hospital, complaining about a persistent headache.  Mot. [108-3] at 1.  A CT scan of his cervical spine revealed "[n]o fracture or malalignment."  *Id*. at 4.  And CT scan of his head revealed "[n]o significant intracranial abnormality."  *Id*. at 10.  Plaintiff has presented no medical records to contradict the summary-judgment evidence, nor does he challenge the veracity of it.

Even if Plaintiff's ailments were considered serious medical needs, his claim against Jones would still fail because those needs were not met with deliberate indifference.  Plaintiff was examined by multiple healthcare providers more than once for alleged head and shoulder pain.  He received several CT scans and x-rays, all of which returned normal results, in the few weeks after his arrest.  Ex. [94] at 12-21; Mot. [108-3] at 1, 4, 10; Mot. [108-4] at 1.  It thus follows that no treatment was necessary for injuries that Plaintiff could not prove existed.  What Plaintiff has raised is nothing more than a disagreement with that decision, but "[a]n inmate's disagreement with medical treatment does not evince deliberate indifference to his serious medical needs."  *See Cooper v. Johnson*, 353 F. App'x 965, 968 (5th Cir. 2009).

25

Jones's Motion [108] for Summary Judgment is granted, and Plaintiff's claims against her are dismissed with prejudice.

### *iv. Unidentified MBN Agents*

More than two years after filing his Complaint, Plaintiff has been unable to identify the MBN Agents listed as Defendants.[5]  On June 8, 2022, Plaintiff was first ordered to "provide the individual names of Defendants identified as 'MBN Agents.'" Order [21] at 2.  Plaintiff could not, suggesting instead that perhaps "none of [the officers involved] are MBN."  Resp. [22] at 5.  At the Omnibus Hearing, Plaintiff was given another chance to identify these MBN Agents.  (Tr. 15 ("[D]o you know their names now?")).  Again, Plaintiff could not provide their names, but he now insists that there are other officers "that [he] ha[s] not [yet] named."  (Tr. 15).

"[T]he duty to liberally construe *pro se* pleadings does not include a duty to read a *pro se* litigant's mind, or the duty to prosecute his lawsuit for him . . . ." *Demos v. Doe*, No. 94-11064, 1995 WL 103632, at *2 (5th Cir. 1995).  The Court has twice solicited the identities of the unnamed MBN Agents, and Plaintiff was unable to provide their names both times.  Plaintiff has possessed the incident reports at least since June 23, 2022.  *See* Resp. [22] at 5 ("I named all names I could find in my reports."); *see also* (Tr. 15 ("I just know that I have the report of all the officers that

---

[5] The unnamed MBN Agents were not discussed in the pending dispositive motions. But Plaintiff is proceeding *in forma pauperis*, Order [8], and his claims are subject to *sua sponte* dismissal under 28 U.S.C. § 1915(e)(2).  *See, e.g.*, *Smith v. Anderson*, No. 2:11-cv-00221-KS-MTP, 2013 WL 1182995, at *1 (S.D. Miss. Feb. 13, 2013) (dismissing a case based on a motion for summary judgment and a "*sua sponte* . . . evaluation pursuant to 28 U.S.C. § 1915(e)(2)"), *report and recommendation adopted by* 2013 WL 1182984, at *1 (S.D. Miss. Mar. 21, 2013).

[were] there and their names.")).  The Court thus concludes that additional discovery is unlikely to provide the identities of these MBN Agents, and they should be dismissed without prejudice for Plaintiff's failure to identify them.  *See, e.g., Hammler v. Gooch*, No. 1:19-cv-00653-AWI-EPG, 2023 WL 2839538, at *1 (E.D. Cal. Apr. 7, 2023) (dismissing a John Doe defendant for the plaintiff's "failure to provide . . . accurate and sufficient information to effect service of the summons and complaint"); *Hay v. George Hill Corr. Facility*, 349 F. Supp. 3d 463, 466-67 (E.D. Pa. 2018) (noting the plaintiff "cannot move forward on his Amended Complaint as pled because it is not clear who he named as Defendants or what each individual did to violate his rights"); *Fields v. Roswarski*, 469 F. Supp. 2d 599, 607-08 (N.D. Ind. 2007) ("A prisoner needs to furnish the court with sufficient information to identify the defendant . . . . Accordingly, the court will dismiss the Doe defendants, and the claims against them.").

In any event, Plaintiff testified that only Defendants Serpas, Allen, Taylor, and Boney were present inside his home and inflicted physical harm on him.  (Tr. 23-24).  Plaintiff has not alleged that these unnamed MBN Agents purported the alleged constitutional violations against him.  "Personal involvement is an essential element of a civil rights cause of action."  *Thompson v. Steele*, 709 F.2d 381, 382 (5th Cir. 1983).  "Vague and non-specific allegations of wrongdoing cannot support a constitutional claim under § 1983."  *Grizzle v. McIntire*, No. 5:22-cv-00017-BQ, 2022 WL 17818101, at *8 (N.D. Tex. Oct. 21, 2022).  Plaintiff's allegations against the

unnamed MBN Agents must separately be dismissed with prejudice for failure to state a claim under 28 U.S.C. § 1915(e)(2)(B)(ii). *See id.* (dismissing Doe defendants with prejudice because the plaintiff "d[id] not . . . assert a single fact that connects [them] to the purported constitutional violations").

## IV. CONCLUSION

The Court has considered and liberally construed Plaintiff's pleadings and testimony, along with the Motions [84] [86] [89] [96] [108] and Responses [115] [116] pending.

**IT IS, THEREFORE, ORDERED AND ADJUDGED** that the law-enforcement Defendants' Motion [84] for Summary Judgment Due to Plaintiff's Failure to Exhaust Administrative Remedies is **DENIED**.

**IT IS, FURTHER, ORDERED AND ADJUDGED** that Harrison County's Motion [86] for Summary Judgment is **GRANTED IN PART AND DENIED IN PART**. Any of Plaintiff's claims against Harrison County, Mississippi, arising after he was incarcerated are **DISMISSED WITHOUT PREJUDICE** for Plaintiff's failure to exhaust administrative remedies.

**IT IS, FURTHER, ORDERED AND ADJUDGED** that the law-enforcement Defendants' Motion [89] for Summary Judgment and Immunity is **GRANTED**. Sheriff Troy Peterson, Sergeant B. Auringer, Investigator W. Collins, Deputy D. Boney, Deputy M. Giardini, Deputy R. Barber, Deputy M. Giouard, Deputy R. Hubbard, Deputy Z. Cobb, Investigator C. Serpas, Investigator D. Bryant,

28

Investigator J. Johnson, Investigator J. Merritt, Investigator J. Putnam, Investigator K. French, K-9 Deputy C. Allen, K-9 Deputy B. Taylor, and Investigator J. Ladner are **DISMISSED WITH PREJUDICE** as Defendants.

   **IT IS, FURTHER, ORDERED AND ADJUDGED** that Harrison County's Motion [96] for Summary Judgment is **GRANTED**.  Harrison County is separately **DISMISSED WITH PREJUDICE** as Defendant.

   **IT IS, FURTHER, ORDERED AND ADJUDGED** that Jones's Motion [108] for Summary Judgment is **GRANTED**.  Nurse Dana Jones is **DISMISSED WITHOUT PREJUDICE** as Defendant for Plaintiff's failure to exhaust administrative remedies.  Jones is separately **DISMISSED WITH PREJUDICE** as Defendant.

   **IT IS, FURTHER, ORDERED AND ADJUDGED** that the unidentified MBN Agents are **DISMISSED WITHOUT PREJUDICE** as Defendants for Plaintiff's failure to provide their names and addresses for service of process.  The unidentified MBN Agents are separately **DISMISSED WITH PREJUDICE** for Plaintiff's failure to state a constitutional claim against them.

   **IT IS, FINALLY, ORDERED AND ADJUDGED** that this case is **CLOSED**.  A separate final judgment will be entered under Federal Rule of Civil Procedure 58.

   **SO ORDERED AND ADJUDGED,** this 26th day of January, 2024.

      *s/* *Bradley W. Rath*
      BRADLEY W. RATH
      UNITED STATES MAGISTRATE JUDGE